IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| TIMOTHY MCLAUGHLIN, | |
| *Plaintiff*, | Civil Action No. 2:21-cv-832 |
| v. | Hon. William S. Stickman IV |
| THE INTERNATIONAL BROTHERHOOD OF TEAMSTERS, LOCAL 249, *et al*, | |
| *Defendants*. | |

## **MEMORANDUM OPINION**

WILLIAM S. STICKMAN IV, United States District Judge

Plaintiff Timothy McLaughlin ("McLaughlin"), a unionized professional truck driver, brought this action against multiple defendants claiming that he has been blacklisted for over a decade from work as a driver on movie and television productions in Pittsburgh, Pennsylvania. (ECF No. 41). Part of McLaughlin's lawsuit concerns his conflict since 2011 with his union, the International Brother of Teamsters, Local Union 249 ("Union" or "Local 249"), over its operation of a hiring hall. Union members put yearly applications on file at the Union for driver positions on movie and television productions and the Union, upon request, forwards all applications on file to production companies who enter into collective bargaining agreements with the Union. Pending before the Court is the Union's motion for summary judgment. (ECF No. 139). It seeks the entry of judgment in its favor as to the claims remaining against it - Counts I, VII, VIII, IX, X, and XI of McLaughlin's amended complaint. (ECF No. 41). For the following reasons, the Court will grant the Union's motion in its entirety.

## I.    STANDARD OF REVIEW

Summary judgment is warranted if the Court is satisfied that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A fact is material if it must be decided to resolve the substantive claim or defense to which the motion is directed. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). There is a genuine dispute of material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The Court must view the evidence presented in the light most favorable to the nonmoving party. *Id.* at 255. It refrains from making credibility determinations or weighing the evidence. *Id.* "[R]eal questions about credibility, gaps in the evidence, and doubts as to the sufficiency of the movant's proof[]" will defeat a motion for summary judgment. *El v. Se. Pa. Transp. Auth.*, 479 F.3d 232, 238 (3d Cir. 2007).

## II.    FACTUAL BACKGROUND

McLaughlin was born in 1952. He is a professional truck driver with a Class A commercial driver's license ("CDL"), and he has been a member of the Union for over fifty years. The Union represents and serves as the collective bargaining representative for approximately 3,200 bargaining unit employees who work for over 100 employers in the public and private industries. Between 2001 and 2011, McLaughlin worked consistently as a driver on movie and television productions in Pittsburgh, Pennsylvania. He has driven almost every piece of movie equipment, including the Grip Trailer, Camera Truck, Water Truck, Star Trailers, and PreRig Electric Trailers. In 2012, McLaughlin suffered a severe injury while working as a driver for Giant Eagle. From 2012 to 2018, McLaughlin did not work. Since October 2018, McLaughlin has worked for First Student, Inc. as a school bus driver, and he is represented by

the Union. McLaughlin has not worked as a movie driver since 2011 despite keeping his CDL active, and always having a current application on file at the Union. (EFC No. 138, pp. 1-2, 4; ECF No. 162, pp. 1, 15-16; ECF No. 163, pp. 2-4; ECF No. 170, pp. 1-4).

By way of a collective bargaining agreement ("CBA") with producers of production companies that film movie and television productions in the Pittsburgh area, the Union represents drivers hired to work for production companies.[1] Since 2008, the Union has operated a system known as the producer's choice ("Producer's Choice") with respect to driving work on movie and television productions, which means that the production companies retain discretion as to the hiring of drivers. Production companies can select drivers from applications forwarded by the Union, but it is under no obligation, contractual or otherwise, to hire drivers referred by the Union. (ECF No. 138, pp. 2, 4-6; ECF No. 162, pp. 5, 16, 20, 22-23; ECF No. 170, p. 5).

---

[1] The Union's CBAs with production companies often contain the following language:

> **4.1** The parties hereto recognize the conditions in this industry require frequent hiring of drivers on a daily and sometimes non-continuous basis. **The Union will maintain a non-exclusive referral process in order to supply qualified employees to the Producer** in a timely manner. The non-exclusive referral process shall in all respects comply with all applicable provisions of law.
>
> > A. **Members and other applicants will be referred to the Producer from the Union upon request.** The Union will provide the Producer with the applications/resumes of any and all interested members and other applicants.
> >
> > B. **Except for reasons prohibited by law, the producer retains the sole and exclusive right to hire whomever they decide and to reject any member or applicant referred by the Union.**
>
> **4.2** The Producer shall immediately notify the Union of the name, start date and position of each person hired into any position covered by this Agreement. The Producer shall permit the Union to take reasonable steps in order to collect Union dues and/or service fees from employees working under this Agreement to the extent legally permissible. This obligation shall be ongoing through the production.

(ECF No. 138, p. 6; ECF No. 162, pp. 20-21) (bold in original).

Production companies hire a transportation coordinator, who must withdraw from the Union, to oversee the entire transportation department for the production. The transportation coordinator hires drivers for the production as well as a transportation captain. The transportation captain is not required to be a Union member, but the position is a Union represented bargaining position. The transportation captain is supervised by and carries out the orders and directives of the transportation coordinator. (ECF No. 138, pp. 9-10; ECF No. 162, p. 32; ECF No. 170, pp. 7, 9-10).

The Union posts notices at the Union hall when a production company is looking for drivers, and it also announces it at the monthly general membership meeting. Individuals interested in obtaining a driving position can apply directly with the production company.[2] The more typical process involves submitting an "Application for Referral" with the Union that is kept on file for referral for one year from the date of submission.[3] The application does not request an individual's date of birth. The application states in boldface, capitalized font: **"LOCAL 249 DOES NOT HAVE ANY RESPONSIBILTY FOR HIRING DECISIONS MADE BY THE PRODUCER."** (ECF No. 138, p. 7; ECF No. 162, pp. 24-26).

Local 249's "Procedures for Referrals to Movie Productions" provides in pertinent part:

> **Local 249 will operate a non-exclusive referral system.** The purpose and intent of the system will be to facilitate the employment opportunities for our members on movie productions in this area and to use these productions as a source for new members. **Local 249 will not negotiate into any collective bargaining agreement for movie productions any provisions that would establish an exclusive referral system. In addition, Local 249 will not interfere with the effort of any individual to become employed directly on a**

---

[2] McLaughlin applied directly with production companies for driver positions on a few occasions. (ECF No. 138, p. 7; ECF No. 162, p. 25).

[3] Typically, at least one hundred driver applications are on file with Local 249. (ECF No. 138, p. 8; ECF No. 162, p. 27).

**movie production instead of or in addition to utilizing the Local 249 referral procedure.**

When Local 249 is informed that a production will be coming into the Local's jurisdiction, the Local will post a Notice using the form attached hereto. In addition, an announcement of the upcoming production will be made at the next Executive Board meeting and the next General Membership Meeting, informing Local members of the opportunity. The Local Union office will accept applications/resumes from both members and nonmembers. The Local Union will forward the applications/resumes of any interested members and non-members to the producer in a timely fashion as provided in the attached Notice. The Local Union reserves the right to recommend particular members based on qualifications, experience in the movie industry and/or current unemployment as a Local 249 member, but **the Local Union will not insist or require that a producer hire any individual.**

In order to encourage membership in this Local Union, any non-member who requests to submit an application will be encouraged to submit an application for membership in Local 249.

Whenever an application/resume is received by the Local Union office that application/resume will be time-stamped, and a copy shall be maintained at the Local Union Office when the original is provided to the producer. Once a member or other individual has provided an application/resume for a movie production to Local 249, the Local Union will maintain that application for one year and will submit that application to any other movie productions that arise during the year unless otherwise instructed by the member/individual. The Local Union Office shall maintain and keep current a list of the members/individuals who have provided applications/resumes to Local 249 and said list shall be available to the Business Agent responsible for the movie productions.

**Local 249 will utilize a standard form contract prepared for movie productions.**

(ECF No. 138, pp. 4-5; ECF No. 162, pp. 19-20). Thus, once a production company enters into a CBA with the Union and requests all of the driver applications on file, the Union forwards all of the applications on file. (ECF No. 138, p. 8; ECF No. 162, p. 28).

McLaughlin has been complaining about the Producer's Choice system to Union officials and members since 2011.[4]  He believes that the seniority of driver applicants is not given sufficient weight and that the system results in nepotism, favoritism, and discrimination.  (ECF No. 138, p. 14; ECF No. 162, p. 47; ECF No. 163, pp. 14-17; ECF No. 170, pp. 17-20).  At some point, he submitted to the Union a seniority proposal for movie driver positions that was rejected. McLaughlin filed a charge with the National Labor Relations Board ("NLRB") in 2012 that contained claims similar to those raised in this suit.  It was dismissed.  McLaughlin has continuously expressed his views about the Producer's Choice system and lodged complaints (emails and letters) with the Union after production companies failed to hire him.  (ECF No. 138, pp. 13-14; ECF No. 162, pp. 43, 47-48; ECF No. 163, pp. 17-30; ECF No. 170, pp. 20-36).  He also filed charges of age discrimination and retaliation with the Equal Employment Opportunity Commission ("EEOC") and the Pennsylvania Human Relations Commission ("PHRC"), followed by lawsuits alleging the same.  *See McLaughlin v. 20th Century Fox Film Corp.*, No. 2:15-cv-00353 (W.D. Pa.) (filed 2015, settled 2017); *McLaughlin v. Boss Prod.*, No. 2:15-cv-00354 (W.D. Pa.) (filed 2015, settled 2016); *McLaughlin v. Summit Ent. LLC*, No. 2:15-cv-00355 (W.D. Pa.) (filed 2015, settled 2016).

In August 2018, McLaughlin requested that Frank recommend him for a job on *A Beautiful Day.* (ECF No. 161-2, p. 99).  Thereafter, he sent a text message to the transportation

---

[4] Union officers are elected to serve three year terms.  (ECF No. 163, p. 4; ECF No. 170, p. 4). Joseph Rossi ("Rossi") was the vice president of the Union from 2000 to 2008, and then the president of the Union from 2009 to 2014.  Michael A. Ceoffe ("Ceoffe") was the vice president of the Union from 2009 to 2014, and the president of the Union as well as the movie business agent from 2015 to 2017.  (ECF No. 163, p. 4; ECF No. 170, p. 4).  Kevin Schmitt ("Schmitt") was elected as the president in 2018, and Keith Frank ("Frank") was elected as the vice president.  Both men have held these positions since then.  Frank also serves as the business agent and represents Union members who work on movies.  (ECF No. 138, p. 2; ECF No. 162, pp. 4-5).

coordinator and captain on *A Beautiful Day* requesting a job and relaying his blacklisting concerns. Frank was copied on the text. (ECF No. 161-2, pp. 100-01). Frank never recommended a particular member to be hired on *A Beautiful Day* (even McLaughlin), and no one at the Union told the transportation coordinator not to hire McLaughlin. In a September 2018 email, McLaughlin complained to Frank about blacklisting and wanted Frank to obtain letters from various transportation coordinators and captains on movie productions as to why McLaughlin was not hired. (ECF No. 163, p. 26; ECF No. 170, p. 31). Thereafter, Frank sent a letter to two transportation coordinators requesting an explanation as to why McLaughlin was not hired but no one responded. (ECF No. 163, pp. 27-28; ECF No. 170, p. 32). In October 2018, McLaughlin sent a letter to Frank requesting that Frank get information from transportation coordinators about their hiring decisions. Later that month, McLaughlin sent another letter complaining that the Union and transportation coordinators on movie productions were blacklisting him. (ECF No. 163, p. 28; ECF No. 170, p. 22). Frank responded in pertinent part:

> You must be aware that this Union represents all members and is not able to compel any member for a statement regarding other members. Obviously, if you feel you have been discriminated against by a member in such a way that it violates the International Constitution or the Local Union By-Laws, you have every right to file charges. However, it is up to you as the charging party to get the evidence that supports those charges. I am sure you must understand that we cannot be taking sides on whether one member violated another member's rights since it is the Local Union Executive Board that in the end will decide whether there has been improper activity by one member against another.
>
> *          *          *
>
> From what you write it appears you have complaints of one sort or another against other Union members. The Local Union is not in a position, nor have they ever been in a position where they can take sides with one member against the other simply because the Local Union's Executive Board may have to make a decision on who was correct and who was not.

> Essentially, the Local Union cannot be gathering information for one member against another then be placed in the position of having to decide whether a member has a valid charge against the other.

(ECF No. 161-2, p. 113).  McLaughlin continued his complaints to the Union about blacklisting in February 2019.  (ECF No. 163, p. 29; ECF No. 170, p. 29).  In April 2019, McLaughlin requested that Frank provide his resume to all producers.  (ECF No. 161-2, p. 139).  In May 2019, McLaughlin asked Frank if the transportation coordinators had ever responded to his inquiries, and McLaughlin again complained about blacklisting, the Producer's Choice system, and various other matters.  (ECF No. 161-2, pp. 140-41).

Then, on August 16, 2019, McLaughlin complained via letter to the Union, specifically his "Union brothers," that he was blacklisted and that "union officials … illegally conspired with these movie production representatives to … blacklist [him] and acquire for themselves and their families and friends lucrative driving jobs."  (ECF No. 161-2, pp. 144-46).  He further claimed:

> I believe what they did and are still doing comes under the definition of labor Racketeering. These movie company representatives are violating RICO laws.
> I believe union officials conspiring with corrupt movie company representatives to acquire $150,000 a year jobs for themselves and their families through "collusive arrangements" while "blacklisting" me, a political opponent at the expense of union members constitutes LABOR RACKETEERING. Please have our attorneys give their opinion on this.
> As my Union representatives I am again requesting a response from these production companies and the individual transportation coordinators as to their reasons for denying me work on at least 45 movies and television shows in the past eight years, even though I am more qualified than probably 90% of the drivers they hired and being requested by Key movie people (including an out of town transportation coordinator) to drive for them.
> Keith, our union attorney stated that you didn't think it was appropriate to ask coordinators Byron Roland and Frank Conforti for a response as to why they have been blacklisting me the elected union steward. (You sent the letters to Marc Scott and Don Kraus with no response.)
> I think you should think that "BLACKLISTING" your elected union steward for eight years would be more inappropriate then asking them their reason why.
> What is the Union's position on inexperienced ex union officials and their families and friends getting lucrative movie jobs, being hired by friends they installed into movie representative hiring positions?

8

They do this while still conspiring to deny me work. Obviously everyone thinks they are covered with the phony "producers choice" hiring policy. Unions have an obligation to represent their members. (especially you would think elected union stewards.)

I am again asking you to get a statement from the producers to ask these coordinators about their discriminatory hiring with their nepotism and favoritism hiring practices (against company policy) and WHY they favor hiring Inexperienced ex union officials and their families while denying work to experienced senior requested drivers.

I will be waiting our attorneys response.

(ECF No. 161-2, pp. 144-46).  Also on August 16, 2019, McLaughlin wrote to Union Secretary Treasurer Rocco Difilippo ("Difilippo") that the Union had failed to post recent productions including *Ma Rainey*, and asked that he be informed of any future movies that planned to film in the area so he could apply directly to the production companies.  (ECF No. 163, p. 31; ECF No. 170, p. 36).

Counsel for the Union responded to McLaughlin and noted that "the union has agreed to your suggestion that it post on its website any information about movies that are being produced in the area once they receive the signed agreement from the producer.  We must wait until a signed agreement is executed before posting such information because frequently producers visit the area in anticipation of doing a shoot but for numerous reasons go elsewhere."  (ECF No. 161-2, pp. 147-48).  The letter further encouraged McLaughlin to contact the United States Attorney or NLRB if he had evidence of movie production companies violating RICO laws so that those agencies could investigate.  Moreover, the letter informed McLaughlin:

Additionally, you must know that the union does not in any way rate members as to who is "more qualified" that another.  When it comes to the movies we simply provide to the producer, or their representative, the names of those individuals who have provided their information to the union so that the union may provide it to anyone requesting individuals looking for jobs on the movies.  That, however, does not stop you from soliciting that work without going through the union.  You have every right to approach any of these producers and if you want to know the producers names I suggest you make arrangements with the union to go to the

union office and the union officials will provide you any information they have regarding movie producers in the area or have been in the area.

(*Id.* at 148). McLaughlin never filed internal charges or a grievance with the Union. (ECF No. 138, pp. 14-15; ECF No. 162, pp. 48-49).

In June 2020, McLaughlin filed charges of age discrimination and retaliation with the EEOC and PHRA against the Union, Marc Scott ("Scott"), Ceoffe, Don Kraus ("Kraus"), and Rossi, claiming that they failed to hire him as a movie driver and/or impeded his efforts to obtain a driver position with production companies.[5] (ECF No. 161-2, pp. 157-64).

Later in 2020, McLaughlin unsuccessfully sought the position of Union trustee. The literature he distributed to Union members included statements like "say 'Yes' to seniority"; "say 'No' to corruption"; "say 'No' to crooked Teamsters"; "Say 'No' to special treatment of friends." He also included the following information:

> As Union steward for movies I won back pay for 23 drivers that the coordinator and his Captain tried to screw them out of.
>
> The Coordinator blacklisted me after 10 years working movies.
> Ceoffe Rossi Schmitt backed corrupt coordinator. (same coordinator that blacklisted last Teamster Captain/Steward that we had to pay hundreds of thousands of dollars)
> THIS IS HOW THEY BACK THE ELECTED UNION STEWARD.
> I called for seniority hiring, Ceoffe Rossi Schmitt wanted phony "producers choice hiring" that takes away seniority hiring and steals jobs off senior drivers.
> I and other senior movie drivers were blacklisted and replaced by Ceoffe Yellow Freight driver buddies.
>
> President Joe Rossi was hired ahead of 200 movie drivers as he retired.
>
> Mike Ceoffe was hired on 5 straight movies as soon as we voted him out of office after one term.
> He was hired by his coordinator buddies (who all blacklisted me, all Teamsters) ahead of 300 movie drivers. Instead of going back to his Yellow freight job he

---

[5] Scott and Kraus have been hired by production companies filming in the Pittsburgh area as transportation coordinators. (ECF No. 163, pp. 5-6; ECF No. 170, pp. 7-8).

probably made more money than any other movie driver having never worked a movie.

Schmitt and his whole ticket know of this corruption and must be part of it or they wouldn't have picked him to run with them.
DON'T VOTE FOR ANY OF THE "EXPERIENCE SLATE."
THEY SHOULD BE CALLED THE "RIGHT TO WORK SLATE."
VOTE FOR SOMEONE THAT WILL VOTE FOR YOU ON THE EXECUTIVE BOARD NOT OFFICERS THAT VOTE FOR THEMSELVES
VOTE TIM MCLAUGHLIN INDEPENDENT TRUSTEE.

(ECF No. 161-2, pp. 443-49).

The Union maintained McLaughlin's application on file for every year he submitted one. (ECF No. 170, p. 36). From June 28, 2019 until December 2021, McLaughlin takes issues with not being hired by production companies for the following productions: (1) *I'm Your Woman* (10/2019 to 12/2019); (2) *Sweet Girl* (11/2019 to 2/2020); (3) *American Rust* Season 1 (2/2020 to 3/2020); (4) *Archive 81* (11/2020 to 3/2021); (5) *The Chair* (2/2021 to 4/2021); (6) *A League of Their Own* (7/2021 to 11/2021); (7) *What If* (7/2021 to 9/2021); (8) *Cha Cha Real Smooth* (8/2021 to 10/2021); (9) *Sprung* (9/2021 to 12/2021); (10) *Rustin* (10/2021 to 12/2021); and (11) *Pale Blue Eye* (11/2021 to 1/2022). (ECF No. 163, p. 33; ECF No. 170, p. 38).

From 2019 to 2021, Local 249 identified 208 drivers hired by production companies to work on television or movie productions. It was unable to identify the date of birth of 48 of the 208 drivers. Of the 160 drivers with known birthdates: 11 were born in the 1940s[6]; 39 were born in the 1950s; 47 were born in the 1960s; 25 were born in the 1970s; 21 were born in the 1980s; and 17 were born in the 1990s. Accordingly, the average age of drivers hired between 2019 to 2021 was: 48.5 years old in 2019; 49.5 years old in 2020; and 50.5 years old in 2021.

_____

[6] McLaughlin disputes the inclusion of one driver in this category as he does not know the individual's date of birth and he has not seen documentation that the individual worked on movies between 2019 and 2021. (ECF No. 162, pp. 50-51). The Court does not find this dispute to be of note as the evidence is clear that at least 10 drivers born in the 1940s worked on movies between 2019 to 2021.

Out of the 160 drivers who worked on movies between 2019 and 2021, 13 drivers were the same age or older than McLaughlin.  (ECF No. 138, pp. 15-21; ECF No. 162, pp. 50-52).  Retirees regularly work on television and movie productions in Pittsburgh.  (ECF No. 138, p. 15; ECF No. 162, p. 50).

### III.    ANALYSIS

**A. Judgment will be entered in favor of the Union as to Count I.**

In Count I of the amended complaint, McLaughlin alleges that he engaged in protected speech under the Labor-Management Reporting and Disclosure Act ("LMRDA") and the Union retaliated against him by blacklisting him from movie driver positions.  (ECF No. 41, ¶¶ 157–74).  McLaughlin maintains that such retaliation constitutes improper disciplinary action and infringement of his right to free speech, in violation of the LMRDA.  (*Id.* ¶ 167).  *See* 29 U.S.C. § 411(a)(2) (affording union members "the right to meet and assemble freely with other members" and "to express any views, arguments, or opinions"); *id.* § 411(a)(5) (barring union members from being "fined, suspended, expelled, or otherwise disciplined" absent certain procedures); *id.* § 412 (providing a civil cause of action for "[a]ny person whose rights secured by the provisions of this subchapter have been infringed").  At the motion to dismiss stage, the Court ruled that McLaughlin's LMRDA claim is limited to alleged blacklisting that occurred on or after June 28, 2019.  (ECF No. 77, p. 16).[7]

Title I of the LMRDA "provides union members with an exhaustive 'Bill of Rights' enforceable in federal court." *Local No. 82, Furniture & Piano Moving v. Crowley*, 467 U.S.

---

[7] The Court also held that McLaughlin was excused from exhausting internal Union remedies with respect to his LMRDA claim.  (ECF No. 77, pp. 16-20).  The Court stands by its prior analysis.

526, 536 (1984) (citing 29 U.S.C. §§ 411–415).  Among those protected rights are the rights to

freedom of speech and assembly:

> Every member of any labor organization shall have the right to meet and assemble
> freely with other members; and to express any views, arguments, or opinions; and
> to express at meetings of the labor organization his views, upon candidates in an
> election of the labor organization or upon any business properly before the
> meeting, subject to the organization's established and reasonable rules pertaining
> to the conduct of meetings. . . .

29 U.S.C. § 411(a)(2); *see also United Steelworkers of Am. v. Sadlowski*, 457 U.S. 102, 111

(1982) (explaining that "the legislators intended [section 411(a)(2)] to restate a principal First

Amendment value—the right to speak one's mind without fear of reprisal").  To state a claim of

retaliation under the LMRDA, a union member must show that "(1) he engaged in protected

expression; (2) he was subjected to an adverse action; and (3) the retaliation was a direct result of

the protected expression."  *McCarthy v. Int'l Ass'n of Machinists & Aerospace Workers*, 2021

WL 5766569, at *4 (3d Cir. Dec. 6, 2021).

   While the subject matter of any protected speech must "directly relate" to the union-

member relationship, *Semancik v. United Mine Workers of Am., Dist. No. 5*, 466 F.2d 144, 154

(3d Cir. 1972), the Third Circuit has articulated a general rule that under the LMRDA, "the

members' right of free speech is given an expansive protection."  *Mallick v. Int'l Broth. of Elec.

Workers*, 644 F.2d 228, 235 (3d Cir. 1981).  McLaughlin has been publicly criticizing the

Producer's Choice system and advocating for the Union's adoption of a seniority-based system

since 2011, but he had to adduce evidence in discovery that he engaged in protected speech on or

after June 28, 2019.  What he has come forth with is an August 16, 2019, complaint to the Union,

and campaign literature he distributed to Union members in late 2020 during his unsuccessful bid

for Union trustee.  The Court has carefully reviewed this evidence.  It finds that McLaughlin

publicly criticized the Producer's Choice system, continued his quest for its elimination and the

implementation of a seniority-based system, and spoke out about his own blacklisting. The Court holds that McLaughlin has met his burden of establishing that he engaged in some protected speech.

However, McLaughlin has failed to adduce evidence of any adverse action by the Union. McLaughlin is an active member of the Union and he has been working as a school bus driver since 2018. The Union has maintained McLaughlin's current application on file and consistently forwarded it to production companies who entered into CBAs with the Union and requested driver applicant referrals. There is no dispute that the Union operates a non-exclusive referral system (the Producer's Choice system) – a system that McLaughlin is vehemently opposed to – and that the Union cannot dictate who production companies ultimately hire for driver positions. Although McLaughlin was not hired on eleven productions from June 28, 2019 until December 2021, on two occasions in 2021, production companies offered him employment that he declined. Lastly, the record is replete with evidence that the Union responded to all of McLaughlin's correspondence (emails and letters), continually advised him of his rights, and offered him avenues of redress for his complaints. McLaughlin never filed an internal Union charge, nor a grievance, and there is no dispute that the Union never subjected McLaughlin to discipline.

There is nothing in the record demonstrating that the Union did anything that could be construed as having impaired McLaughlin from obtaining work as a driver on television and/or movie productions. The Union is not liable for the actions or inactions of transportation coordinators (and captains) on television and movie productions, as it is not their employer. While McLaughlin may be of the belief that the transportation coordinators remain tightly linked to the Union, he adduced no evidence to support his speculation. The fact of the matter is that

14

production companies hire transportation coordinators who are not represented by the Union.  To the extent that McLaughlin believes that the Union should have recommended him for employment as a driver to production companies, the Union has no obligation to do so given that it had to enact the Producer's Choice system after a NLRB decision against it finding that a Union official violated federal labor law by recommending certain individuals be hired on productions.  (ECF No. 163, pp. 10-11; ECF No. 170, p. 13).  Significantly, there is no evidence in the record that on or after June 28, 2019, the Union recommended any particular Union members with an application on file to a production company.  It merely forwarded all applications on file to the production companies upon request.

There is simply no evidence of any concrete adverse action by the Union against McLaughlin.

Furthermore, assuming *arguendo* that McLaughlin had adduced evidence that he was subjected to an adverse action by the Union, no causal link exists between his complaints and anything the Union did or failed to do.[8]  McLaughlin makes much of what happened as far back as 2011, but it is largely irrelevant as his blacklisting claim is limited to what occurred on or after June 28, 2019.  The Court finds the temporal proximity lacking between his complaint (in August 2019), his unsuccessful run for Union trustee (in late 2020), and his failure to be hired as a driver on various productions from June 28, 2019 until December 2021. *See e.g., Marra v. Philadelphia Hous. Auth.*, 497 F.3d 286, 303 n.14 (3d Cir. 2007) (nine-month gap between

---

[8] The Third Circuit has not addressed the showing required to establish a causal link between a plaintiff's protected activity and the adverse action to sustain an LMRDA retaliation claim.  *See Doyle v. United Auto. Aerospace and Agric. Implement Workers of Am. Local 1069*, 761 F. App'x 136, 139 n. 4 (3d Cir. 2019).  A causal connection for a retaliation claim under the First Amendment may be shown by either "(1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link." *Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007).

protected speech and adverse action was "undoubtedly" not unusually suggestive); *Thomas v. Town of Hammonton*, 351 F.3d 108, 114 (3d Cir. 2003) (three weeks between the protected expression and adverse action did "not provide substantial support for [plaintiff's] position").

Similarly, there is no evidence of a pattern of antagonistic conduct. In fact, there is no evidence of any continuing hostility by the Union against McLaughlin. The Union has responded to McLaughlin's complaints (via letter and email) and continually advised him of his rights and offered him avenues of redress for his complaints. In 2018, Frank even assisted McLaughlin by reaching out to production companies to inquire about why they did not hire McLaughlin. There is no evidence that Union leaders or members made disparaging comments about McLaughlin. There is no evidence that any disparaging remarks about McLaughlin by Union leaders or members were made to production companies hiring drivers. No evidence exists that the Union failed to forward McLaughlin's application to production companies, or that Union leaders or members told the transportation coordinator on any production not to hire McLaughlin.

McLaughlin relies on circumstantial and speculative inferences as well as his own self-serving testimony to argue that the record, as a whole, creates an inference that the Union retaliated against him. The Court disagrees. There is simply no evidentiary basis to link McLaughlin's isolated incidents of Union related protected speech with the production companies' decision not to hire him on various productions from June 28, 2019, until December 2021.

McLaughlin has failed to make a sufficient showing to survive the Union's motion for summary judgment at to Count I. The Union is entitled to judgment in its favor on this claim as a matter of law. *See Celotex*, 477 U.S. at 323 (stating that the movant is entitled to judgment as

a matter of law when the non-movant fails to make "a sufficient showing on an essential element of her case with respect to which she has the burden of proof.").

### B. Judgment will be entered in favor of the Union as to Counts VII, VIII, IX, and X.

In Count VII of the amended complaint, McLaughlin asserts that the Union retaliated against him in violation of the Age Discrimination in Employment Act of 1967 ("ADEA") by failing to refer him for employment as a movie driver and/or by causing employers not to hire him for productions, including *I'm Your Woman*, *Sweet Girl*, and *American Rust*. (ECF No. 41, ¶¶ 135–36, 138, 147, 238–50). Count IX makes the same claim of retaliation under the Pennsylvania Human Relations Act ("PHRA"), though it is limited to McLaughlin's failure to be hired for *American Rust*. (*Id.* ¶¶ 262–75). Count VIII alleges that the Union discriminated against McLaughlin based on age in violation of the ADEA when it failed to refer him and/or caused him not to be hired for *I'm Your Woman*, *Sweet Girl*, and *American Rust*. (*Id.* ¶¶ 251–61). Count X asserts the same claim of age discrimination under the PHRA, but again, it is limited to McLaughlin's failure to be hired for *American Rust*. (*Id.* ¶¶ 276–87). The Court, at the motion to dismiss stage, limited McLaughlin's ADEA age discrimination and retaliation claims as to conduct occurring on or after August 30, 2019, and his PHRA age discrimination and retaliation claims to conduct occurring on or after December 28, 2019. (ECF 77, p. 44).

The ADEA and the PHRA contain "analogous provision[s]" with respect to age discrimination and retaliation. *Simpson v. Kay Jewelers*, 142 F.3d 639, 644 n.5 (3d Cir. 1998). First, the statutes bar age discrimination by employers. The ADEA makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual or otherwise discriminate

against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). Similarly, the PHRA makes it unlawful for any employer, "because of the . . . age . . . of any individual or independent contractor, to refuse to hire or employ or contract with, . . . or to otherwise discriminate against such individual or independent contractor with respect to compensation, hire, tenure, terms, conditions or privileges of employment or contract, if the individual or independent contractor is the best able and most competent to perform the services required." 43 P.S. § 955(a). Second, the statutes prohibit age discrimination by labor organizations. The ADEA makes it unlawful for a labor organization to (1) "discriminate against[] any individual because of his age," (2) "classify or fail or refuse to refer for employment any individual[] in any way which would deprive or tend to deprive any individual of employment opportunities . . . because of such individual's age," or (3) "cause or attempt to cause an employer to discriminate against an individual" because of his age. 29 U.S.C. § 623(c). The PHRA, in turn, makes it unlawful for a labor organization, "because of the . . . age . . . of any individual . . . to discriminate against such individuals with respect to hire, tenure, terms, conditions or privileges of employment or any other matter, directly or indirectly, related to employment." 43 P.S. § 955(c). Third, the statutes prohibit retaliation by employers and labor organizations. The ADEA makes it unlawful "for an employer to discriminate against any of his employees or applicants for employment, . . . or for a labor organization to discriminate against any member thereof or applicant for membership, because such individual, member or applicant for membership has opposed any practice made unlawful by [section 623], or because such individual, member or applicant for membership has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or litigation under [the ADEA]." 29 U.S.C. § 623(d). Likewise, the PHRA makes it unlawful

for any person, employer, or labor organization "to discriminate in any manner against any individual because such individual has opposed any practice forbidden by [the PHRA], or because such individual has made a charge, testified or assisted, in any manner, in any investigation, proceeding or hearing under [the PHRA]." 43 P.S. § 955(d).

For the following reasons, judgment will be entered in favor of the Union on all of McLaughlin's claims against it under the ADEA and PHRA.

The Union contends that holding it liable for the production companies' failure to hire McLaughlin is precluded by *Anjelino v. New York Times Co.*, 200 F.3d 73 (3d Cir. 1999).[9]  Its argument is based on the following passage from *Anjelino*:

> We will affirm the dismissal of all claims against the Union because the Union was not the employer of the appellants; this is so even though some of the supervisors and workers who are alleged to have discriminated against the appellants may have been members of the Union. While a union may be held liable under Title VII, the record here does not demonstrate that the Union *itself* instigated or actively supported the discriminatory acts allegedly experienced by the appellants. Therefore, the Union is not liable. *See Carbon Fuel Co. v. United Mine Workers*, 444 U.S. 212, 217–18, 100 S.Ct. 410, 62 L.Ed.2d 394 (1979); *Berger v. Iron Workers, Local 201*, 843 F.2d 1395, 1429–30 (D.C. Cir. 1988); *see Philadelphia Marine Trade Ass'n v. Local 1291 Int'l Longshoremen's Ass'n*, 909 F.2d 754, 757 (3d Cir. 1990). Rather, the Times was the party responsible for assigning work to the appellants and ensuring that the work place was not contaminated with sex and race-based discrimination and harassment.

*Id.* at 95–96 (emphasis in original; footnote omitted). In *Anjelino*, the employer (through its agents) was the perpetrator of  "the discriminatory acts allegedly experienced by the appellants." *Id.* at 95.  The Court holds that *Anjelino* governs when a plaintiff attempts to hold a union liable for discrimination perpetrated by an employer, not where an individual contends that the union was itself the perpetrator of discrimination.  Where a plaintiff contends that a labor organization is liable for discrimination engaged in by an employer, *Anjelino* precludes a finding of union

---

[9] Notably, McLaughlin has proffered no response to the Union's argument.  (*See* ECF No. 164).

liability in the absence of evidence that the union "instigated or actively supported" the underlying acts of discrimination. *Id.* at 95.

Thus, in this case, the Union cannot be held liable for the production companies' alleged discrimination unless it took an active role in the discrimination. The Court concurs with the Union that McLaughlin has not proffered evidence of such conduct. The Union has maintained McLaughlin's current application on file and consistently forwarded it to production companies who requested driver applicant referrals after entering into a CBA with the Union. There is no dispute that the Union operates a non-exclusive referral system (the Producer's Choice system), and it does not have the authority to dictate who production companies hire for driver positions. Although McLaughlin was not hired on eleven productions from June 28, 2019, until December 2021, on two occasions in 2021, production companies offered him employment that he declined. During the time period at issue, McLaughlin never filed an internal union charge or a grievance. There is no record evidence demonstrating that the Union did anything that could be construed as discriminatory.

The crux of McLaughlin's allegation is his belief that the Union should have recommended him for employment as a driver to production companies, and its refusal to do so is indicative of discrimination. However, the Union had no obligation to specifically recommend McLaughlin for a driving position given the existence of the Producer's Choice system. The Union has not recommended any particular Union members with applications on file to production companies. Instead, it forwards all applications on file to the production companies. McLaughlin attempts to impute the actions of transportation coordinators and captains employed by the production companies to the Union, but the transportation coordinator, who makes the hiring decisions, is not a Union member. The transportation captain, who is hired and supervised

by the transportation coordinator, is not required to be a member of the Union, although the captain position is a Union represented bargaining unit position. Absolutely no evidence exists that any Union official (or member) reached out to a production company's transportation coordinator or captain and instigated or actively supported not hiring McLaughlin. No evidence exists that the Union instigated or actively supported production companies hiring any Union applicants.

Although a union may be held liable under the ADEA and PHRA, McLaughlin has failed to come forth with concrete evidence that the Union itself instigated or actively supported the discriminatory acts allegedly experienced by McLaughlin. This is to say that McLaughlin has failed to meet his burden of production, and no genuine dispute of material fact exists. Consequently, judgment will be entered in favor of the Union on all of McLaughlin's ADEA and PHRA claims.

The Court would further note that even if McLaughlin had demonstrated the Union instigated or actively supported the production companies' underlying acts of alleged discrimination, he has failed to meet his evidentiary burden of production as to his age discrimination and retaliation claims.

McLaughlin failed to establish a prima facie case of age discrimination. For the reasons already discussed repeatedly above, he did not suffer an adverse employment action by the Union.[10]    Since the Union forwarded all applications on file to the production companies,

_____

[10] Age discrimination claims under the ADEA and PHRA are subject to the burden-shifting framework of *McDonnell Douglas* where the plaintiff relies on circumstantial evidence of discrimination. *See Willis v. UPMC Children's Hosp. of Pittsburgh*, 808 F.3d 638, 644 (3d Cir. 2015); *Glanzman v. Metro. Mgmt. Corp.*, 391 F.3d 506, 512 (3d Cir. 2004); *Simpson*, 142 F.3d at 644 n.5. *See generally McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973). First, the plaintiff must establish a prima facie case of age discrimination, which creates an "inference of unlawful discrimination." *Willis*, 808 F.3d at 644 (citation omitted). The plaintiff must show

McLaughlin has not deduced evidence demonstrating that it referred younger applicants instead of him. In fact, the applications on file at the Union did not even contain the ages of applicants. There is no evidence that the Union failed to forward his application to production companies because of his age – it was consistently forwarded. There is no evidence that the Union treated him differently than anyone else with an application on file at the Union, much less someone outside of his protected class. Additionally, the record is completely devoid of any discriminatory remarks or facts to suggest that any Union leaders or members possessed age-based animus. There is no evidence that any Union leaders or members made any comments about McLaughlin's age, or any applicant's age, to production companies seeking referrals.

McLaughlin has not come forth with evidence that the driver positions on the various productions in the time frames at issue (on or after August 30, 2019, for the ADEA claim, and on or after December 28, 2019, for the PHRA claim) were filled by sufficiently younger people so as to create an inference of age discrimination. From 2019 to 2021, the Union identified 208

---

that he (1) is at least forty years of age, (2) suffered an adverse employment decision, (3) is qualified for the position, and (4) the position was filled by a sufficiently younger person to create an inference of age discrimination. *Id.* Second, the burden of production shifts to the employer to prove a legitimate, nondiscriminatory reason for the adverse employment decision. *Id.* Third, the plaintiff must show that the employer's articulated reason was a pretext, and the actual reason was discrimination. *Id.* at 644–45; *see also Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994) ("[T]he plaintiff must convince the factfinder '*both* that the reason was false, *and* that discrimination was the real reason.'" (citation omitted)). As to the latter showing, the plaintiff need not prove that "age was the sole cause of the challenged decision." *Miller v. CIGNA Corp.*, 47 F.3d 586, 595 (3d Cir. 1995). Instead, he or she must demonstrate "by a preponderance of the evidence that there [was] a 'but-for' causal connection between the plaintiff's age and the employer's adverse action—i.e., that age actually played a role in the employer's decisionmaking process and had a determinative influence on the outcome of that process." *Id.* at 595–96 (cleaned up); *see also Gross v. FBL Fin. Servs.*, 557 U.S. 167, 177–78 (2009). To do so, the plaintiff may point to evidence showing "that the employer has previously discriminated against [him or] her, that the employer has discriminated against other persons within the plaintiff's protected class or within another protected class, or that the employer has treated more favorably similarly situated persons not within the protected class." *Simpson*, 142 F.3d at 645.

drivers hired by production companies to work on television or movie productions. Of the 160 drivers with identifiable birthdates: 11 were born in the 1940s; 39 were born in the 1950s; 47 were born in the 1960s; 25 were born in the 1970s; 21 were born in the 1980s; and 17 were born in the 1990s. Accordingly, the average age of drivers hired between 2019 to 2021 was: 48.5 years old in 2019; 49.5 years old in 2020; and 50.5 years old in 2021. Out of 160 drivers who worked on movies between 2019 and 2021, 13 drivers were the same age or older than McLaughlin. (ECF No. 138, pp. 15-21; ECF No. 162, pp. 50-52). This evidence negates the inference that younger applicants were given more favorable treatment than those over the age of forty. In fact, the evidence reveals that older applicants, particularly those over the age of fifty, were given more favorable treatment in hiring decisions by production companies. Looking at the spread of drivers hired over the time frame McLaughlin takes issue with, it cannot be inferred that the production companies' decision not to hire him had anything to do with his age.

As to McLaughlin's retaliation claims, he has failed to establish a prima facie case for the same reasons that he failed to ascertain evidence establishing his LMRDA claim.[11] No evidence exists that he suffered an adverse action by the Union. McLaughlin has been employed as a

---

[11] Retaliation claims under the ADEA and PHRA based on circumstantial evidence are likewise subject to the *McDonnell Douglas* framework. *See Daniels v. Sch. Dist. of Phila.*, 776 F.3d 181, 193 (3d Cir. 2015). The plaintiff must first establish a prima facie case of retaliation by showing: (1) protected employee activity; (2) adverse action by the employer after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action. *Id.* To establish a causal connection, a plaintiff may point to an "unusually suggestive" temporal proximity between the protected activity and the adverse action. *Id.* at 196 (citation omitted). Alternatively, a plaintiff may rely on "any intervening antagonism by the employer, inconsistencies in the reasons the employer gives for its adverse action, and any other evidence suggesting that the employer had a retaliatory animus when taking the adverse action." *Id.* If the plaintiff makes these showings, the burden of production shifts to the employer, who must present a legitimate, nonretaliatory reason for the adverse action. *Id.* at 193. If the employer does so, the burden shifts back to the plaintiff to show that the employer's articulated reason was false, and the real reason was retaliation. *Id.*

school bus driver since 2018, and the evidence is clear that the Union is not involved in the hiring decisions of the production companies.    No causal connection exists between McLaughlin's complaints[12] and anything the Union did during the relevant time period – on or after August 30, 2019, for the ADEA claim  and on or after December 28, 2019, for the PHRA claim.  The Court finds the temporal proximity lacking between his complaints and his failure to be hired as a driver on various productions.    There is no evidence of a pattern of actual antagonistic conduct.   In fact, there is no evidence of any continuing hostility by the Union against McLaughlin. The Union responded to McLaughlin's complaints (via letter and email), and continually advised him of his rights, and offered him avenues of redress for his complaints. There is no evidence that any Union leaders or members made disparaging comments about McLaughlin.  There is no evidence that any disparaging remarks about McLaughlin by Union leaders or members were made to production companies hiring drivers.  No evidence exists that the Union failed to forward McLaughlin's application to production companies, or that Union leaders or members told the transportation coordinator or captain on any production not to hire McLaughlin.

McLaughlin relies on circumstantial and speculative inferences as well as his own self-serving testimony to argue that the record as a whole creates an inference that the Union retaliated against him.  The Court disagrees.  There is simply no evidentiary basis in the record to link McLaughlin's isolated incidents of Union related protected speech with the production companies' decision not to hire him on various productions.

Judgment will be entered in favor of the Union as to Counts VII, VIII, IX, and X.

**C.  Judgment will be entered in favor of the Union as to Count XI.**

---

[12] Given the appliable time frame, the only viable protected activity at issue is McLaughlin's distribution of his campaign material during his unsuccessful run for Union trustee in late 2020.

McLaughlin alleges in Count XI of his amended complaint that the Union breached its duty of fair representation under the National Labor Relations Act ("NLRA") by "failing or refusing to refer him for employment" and by "causing employers not to hire him for retaliatory reasons." (ECF No. 41, ¶¶ 288–302). The Court previously limited this claim with respect to allegations of blacklisting that occurred on or after June 28, 2019. (ECF No. 77, p. 56).

"[A] labor organization has a statutory duty of fair representation under the [NLRA]." *Breininger v. Sheet Metal Workers Int'l Ass'n Local Union No. 6*, 493 U.S. 67, 73 (1989). *See generally* 29 U.S.C. §§ 151–169. This duty is "implied from [a union's] status under § 9(a) of the NLRA as the exclusive representative of the employees in [a bargaining] unit." *Marquez v. Screen Actors Guild*, 525 U.S. 33, 44 (1998); *see also* 29 U.S.C. § 159(a). A union must "serve the interests of all members without hostility or discrimination toward any, [] exercise its discretion with complete good faith and honesty, and [] avoid arbitrary conduct." *Vaca v. Sipes*, 386 U.S. 171, 177 (1967). Accordingly, "a union breaches the duty of fair representation when its conduct toward a member of the bargaining unit is arbitrary, discriminatory, or in bad faith." *Marquez*, 525 U.S. at 44.

"In the hiring hall context, . . . an employee may bring a claim solely against the union based on its wrongful refusal to refer him for work." *Breininger*, 493 U.S. at 82; *see also O'Rourke v. Crosley*, 847 F. Supp. 1208, 1221 (D. N.J. 1994) ("[T]he allegation that a union discriminated against a dissident member by refusing to refer him for employment states a claim for breach of the duty of fair representation that is cognizable in federal court."). However, the NLRB has held that:

> Where a union has a nonexclusive referral arrangement with an employer, the union has no exclusive status relating to potential employees. Individuals can obtain employment either through the union's hiring hall or through direct application to the employer. Without the exclusive bargaining representative

status, the statutory justification for the imposition of a duty of fair representation does not exist. Accordingly, no duty of fair representation attaches to a union's operation of a nonexclusive hiring hall.

*Teamsters Local 460 (Superior Asphalt)*, 300 NLRB 441, *1 (1990). *See also Reed v. Int'l Union of Painters*, 03cv1186, 2009 WL 10689849, *3 (W.D. Pa. April 14, 2009) (agreeing with *Reed* and stating "the Court agrees with defendant unions that defendant unions have no duty of fair representation with regard to hiring where, as here, the employer has the discretion to hire whomever it chooses.").

As repeatedly discussed herein, the Union employs a nonexclusive hiring hall in the form of a Producer's Choice system wherein production companies retain the sole hiring discretion. Production companies are free to hire individuals who do not utilize the Union's Producer's Choice referral system. The standard CBA between the Union and production companies typically provides that the producers retain "the sole and exclusive right to hire whoever they decide and to reject any member or applicant referred by the Union." (ECF No. 138, p. 6; ECF No. 162, pp. 20-21). The application a Union member completes to keep on file at the Union states in boldface, capitalized font: **"LOCAL 249 DOES NOT HAVE ANY RESPONSIBILTY FOR HIRING DECISIONS MADE BY THE PRODUCER."** (ECF No. 138, p. 7; ECF No. 162, pp. 24-26). No evidence has been deduced that the Union deviated from the rules governing its nonexclusive hiring hall during the timeframe at issue. McLaughlin has failed to come forth with any evidence that the Union did anything other than forward all driver applications on file, including McLaughlin's, to the production companies upon request. Additionally, McLaughlin has not adduced evidence of an actual agreement between a production company and the Union to hire drivers only referred by the Union. No concrete evidence has been brought forth to viably dispute the existence of a nonexclusive hiring hall.

Nevertheless, McLaughlin opines that the transportation coordinators and captains remain tightly linked to the Union. He has failed to adduce any evidence proving such a relationship for the productions at issue for which McLaughlin did not receive offers of employment. While McLaughlin believes the Union has influence over production companies' hiring decisions by virtue of alleged ties transportation coordinators and captains had (or may have) with the Union, there are no concrete facts of record supporting his speculation. The fact that former Union officer Ceoffe was hired by production companies to work as a driver after he left office in 2018 is not dispositive evidence proving that the Union did not run a nonexclusive hiring hall. (ECF No. 163, p. 24; ECF No. 170, p. 28). It is also not dispositive evidence disproving the existence of a nonexclusive hiring hall that Rossi, a former Union officer and a retiree, was hired to work for production companies. (ECF No. 163, pp. 21-22; ECF No. 170, p. 27). No evidence exists that new Union leadership advocated for these men to be hired by production companies, or that it advocated for anyone to be hired during the time period in question (on or after June 28, 2019). That the transportation coordinators may have liked working with certain Union members and routinely hired them as drivers is an issue beyond the purview of the Union when it complied with the CBAs and Producer's Choice system and forwarded all applications on file to production companies. Given the fact that the Union has adopted the nonexclusive referral system, it was under no obligation to implement a process for applicants who wished to apply directly to production companies instead of keeping their application on file at the Union.

Assuming *arguendo* that the Union actually has a duty with respect to the operation of the nonexclusive referral arrangement with production companies, McLaughlin's claim still cannot withstand the Union's motion for summary judgment. McLaughlin has only come forth with actions he believes the Union could have taken – like recommending him personally to the

production companies (which would have violated the terms of the nonexclusive hiring hall) – without offering any legal authority demonstrating that the Union had a duty to do such things. The evidence of record is that the Union treated him fairly and the same as other Union members with applications on file for driver positions. Although McLaughlin did not like the job offers he received from production companies due to their limited nature, the fact remains that he was offered some work by production companies. McLaughlin never filed an internal charge or grievance with the Union, and therefore, there is no evidence that the Union acted arbitrarily, discriminatorily, or in bad faith in handling a charge or grievance. Lastly, McLaughlin has not come forth with any evidence that on or after June 28, 2019, Union leadership or members treated him with hostility.

The Union's motion will be granted as to Count XI.

## IV.    CONCLUSION

For the foregoing reasons, the Union's motion will be granted in its entirety and summary judgment will be entered in its favor by Orders of Court to follow.

BY THE COURT:

WILLIAM S. STICKMAN IV
UNITED STATES DISTRICT JUDGE

11/19/24
Date